IN THE SUPREME COURT OF NORTH CAROLINA

No. 35PA21

Filed 6 April 2023

IN THE MATTER OF: A.J.L.H., C.A.L.W., M.J.L.H.

On discretionary review pursuant to N.C.G.S. § 7A-31 of a unanimous decision of the Court of Appeals, 275 N.C. App. 11 (2020), vacating and remanding an order entered on 13 December 2019 by Judge Tonia A. Cutchin in District Court, Guilford County. Heard in the Supreme Court on 31 January 2023.

*Mercedes O. Chut for petitioner-appellant Guilford County Department of Health and Human Services.*

*Matthew D. Wunsche, GAL Appellate Counsel, for appellant Guardian ad Litem.*

*Benjamin J. Kull for respondent-appellee father.*

*Leslie Rawls for respondent-appellee mother.*

DIETZ, Justice.

In 2019, the trial court adjudicated nine-year-old Margaret as an abused and neglected juvenile and adjudicated Margaret's two younger siblings as neglected juveniles.

Respondents, who are Margaret's mother and stepfather, admitted that they whipped Margaret with a belt, leaving marks and bruises on her back and neck; forced Margaret to stand in the corner for many hours at a time; and made Margaret sleep on the bare floor. Respondents told social workers that they took these actions

to address Margaret's misbehavior, but also admitted that they imposed this discipline—including the whippings with a belt—day after day for weeks or perhaps even months. Respondents also insisted to social workers that their actions were appropriate and that they would continue to discipline Margaret in this manner until her behavior improved.

On appeal, the Court of Appeals reversed the trial court's adjudications, holding that the trial court improperly admitted some hearsay evidence. The court held that the trial court's reasoning was so "heavily reliant and intertwined with" the hearsay evidence that the proper remedy was to vacate the trial court's order and remand for a new hearing with respect to Margaret. *In re A.J.L.H.*, 275 N.C. App. 11, 23 (2020). The Court of Appeals also ordered the trial court to dismiss the petitions directed at Margaret's younger siblings. *Id.* at 24. Finally, the Court of Appeals instructed the trial court that, if it once again adjudicated Margaret as abused or neglected, the trial court must "order generous and increasing visitation between Margaret and her mother." *Id.* at 25.

We allowed discretionary review to reaffirm the proper role of an appellate court in reviewing a trial court's adjudication and disposition in a juvenile proceeding. As explained below, if the reviewing court determines that there are findings unsupported by the record, the reviewing court simply disregards those findings and examines whether the remaining findings support the trial court's determination. The reviewing court should not speculate about how "heavily" the trial court might

have relied on one finding as opposed to another. Likewise, the best interests determination during the disposition phase is a matter left to the sound discretion of the trial court. In the rare instances when a reviewing court finds an abuse of that discretion, the proper remedy is to vacate and remand for the trial court to exercise its discretion. The reviewing court should not substitute its own discretion for that of the trial court.

Applying these principles here, we hold that the trial court's order contains sufficient findings, supported by clear, cogent, and convincing evidence, to support the court's adjudications of Margaret and her two siblings. We therefore reverse the decision of the Court of Appeals and remand for that court to properly address respondents' arguments concerning the disposition order.

**Facts and Procedural History**

Respondent-mother is the mother of Margaret, Chris, and Anna.[1] Respondent-father lives with respondent-mother and the children but is the biological father only of the youngest child, Anna. The fathers of Margaret and Chris are not parties to this appeal.

In May 2019, the Guilford County Department of Health and Human Services received a report of inappropriate discipline of Margaret. According to the report, Margaret "became extremely upset" following an incident at school and told school personnel that "she would be getting a whipping from her step-father just like she

---

[1] We use pseudonyms to protect the identities of the juveniles and for ease of reading.

had done the previous day." The report noted that there were three marks on Margaret's back "where the skin was broken and appeared to be from a belt mark" as well as red marks on Margaret's arms. The report further indicated that respondent-mother arrived at the school and stated that Margaret "was going to be punished again when she went home" and that Margaret "was afraid to go home."

The next day, DHHS received a second report that Margaret had a new injury on the upper part of her back or neck "that appeared to be like a silver dollar." Margaret explained that she "was hit" but would not give any details. Margaret was shaking and hiding under a desk, and she explained that she did not want to go home because "they" were "going to hurt me."

In response to this report, a social worker, Lisa Joyce, went to Margaret's school that day to speak with her. Joyce found Margaret under a desk in the school counselor's office. Margaret appeared nervous and told Joyce that she was afraid to go home. Margaret told Joyce that respondent-father hit her with a belt buckle, causing the marks on her back, and that respondents punished her by making her sleep on the floor without covers and stand in the corner for hours at a time. Joyce observed marks on Margaret's lower back and at the base of her neck, consistent with the two reports.

After speaking to Margaret, Joyce met with respondent-mother to discuss the allegations. Respondent-mother stated that Margaret "has been lying a lot lately" and that she knew about the marks on Margaret's back. She explained that the marks

were "from the disciplinary action that she had asked [respondent-father] to perform" but that the marks were "accidental" due to Margaret moving around and causing respondent-father to hit her back instead of her buttocks area.

Respondent-mother also told Joyce "that she does take the bed privileges away for lying, that she does make [Margaret] stand in the corner from about 3:30 PM to around 6:00 PM," and that after stopping for dinner, "the child goes back to standing in the corner until it's bedtime." When asked about the frequency of punishment, respondent-mother stated "that recently it had been occurring about every day" due to Margaret's behavior. When Joyce expressed the view that the discipline seemed "extreme to be using on the child," respondent-mother responded that she did not feel like what she was doing was wrong and she "felt like that this was appropriate."

Joyce also spoke with respondent-father. He reported to Joyce that he had physically disciplined Margaret in the days leading up to the DHHS reports and that he did so to "discourage the child from lying." Respondent-father also confirmed that Margaret "is made to stand in the corner for two to three hours at a time" and "made to sleep on the floor" as additional forms of discipline. When asked how often these disciplinary actions were happening, respondent-father stated that "it had been occurring a lot" in the past two months. Joyce asked whether respondent-father thought the practices were appropriate, and he responded that "he didn't see anything wrong with the disciplinary practices that they were using."

DHHS entered into a safety plan with respondents, under which Margaret was

placed with her maternal grandmother. Chris and Anna remained in the home with respondents. Respondent-mother was charged with misdemeanor child abuse, and respondent-father was charged with assault on a child under the age of twelve in connection with their discipline of Margaret.

Between May and August 2019, DHHS social workers made home visits to check on Chris and Anna. They found no issues of concern. On 8 August 2019, DHHS held a meeting with respondents. The DHHS staff members explained their concerns about Margaret's discipline to respondents; however, respondents continued to defend their discipline of Margaret, with respondent-mother explaining that she was trying to "teach" Margaret that if Margaret continued misbehaving "she could end up in jail." Respondents did not commit to stop disciplining Margaret as they had in the past and did not acknowledge that these repeated, daily disciplinary measures— including whippings with a belt—were inappropriate for a nine-year-old child.

The following day, DHHS filed juvenile petitions alleging that Margaret was abused and neglected and that three-year-old Chris and three-month-old Anna were neglected. DHHS obtained custody of all three children.

After a hearing in which the trial court received evidence concerning the facts described above, the court entered an adjudication and disposition order on 13 December 2019. In the order, the trial court adjudicated Margaret an abused and neglected juvenile and adjudicated Chris and Anna as neglected juveniles. In its disposition order, the court placed Margaret with a relative and Chris and Anna in

foster care. The court determined that it was not in the children's best interests for respondents to have any visitation with the children while they worked on their case plans with DHHS. The court also scheduled a review hearing for several months after the date of the order.

Respondents timely appealed. The Court of Appeals vacated and remanded the adjudication and disposition order in a written opinion. *In re A.J.L.H.*, 275 N.C. App. 11, 25 (2020). After holding that some of the trial court's findings relied on inadmissible hearsay statements from Margaret, the Court of Appeals vacated Margaret's adjudication. The court explained that it was "apparent the trial court's abuse adjudication is heavily reliant and intertwined with its findings based on inadmissible evidence." *Id.* at 23.

The court remanded the matter "for a new hearing at which the trial court should make findings on properly admitted clear and convincing evidence and make new conclusions of whether" Margaret is an abused or neglected juvenile. *Id.* The Court of Appeals also held that the trial court's adjudications of Chris and Anna were "based solely on its conclusion Margaret was purportedly abused and neglected" and reversed the trial court's adjudication for those children. *Id.* at 24. Finally, although the court's decision to vacate the adjudication order meant there was no need to address the disposition order, the Court of Appeals held that, if the trial court again adjudicates Margaret as abused or neglected, the trial court must "order generous and increasing visitation between Margaret and her mother." *Id.* at 25.

DHHS timely filed a petition for discretionary review under N.C.G.S. § 7A-31 and the guardian ad litem joined the request for review. This Court allowed the petition.

## Analysis

We allowed discretionary review on sixteen separate issues in this appeal. We begin by addressing a series of issues concerning the Court of Appeals' analysis of the findings of fact and underlying evidence in the record. We then turn to the Court of Appeals' analysis of the disposition order and its mandate to the trial court to award "generous and increasing" visitation with Margaret on remand.

### I.      Hearsay evidence

We first address the Court of Appeals' hearsay analysis. The Court of Appeals rejected a number of findings by the trial court—all of which are located in Finding of Fact 14 in the trial court's order—on the ground that these findings relied on inadmissible hearsay. These findings address statements Margaret made to school personnel and to Lisa Joyce, the social worker who interviewed Margaret.

The relevant information in Margaret's out-of-court statements is almost entirely duplicative of other evidence admitted in the case—mainly because Joyce questioned respondents about Margaret's statements and respondents confirmed they were accurate. But the Court of Appeals nevertheless held that it was "apparent the trial court's abuse adjudication is heavily reliant and intertwined with its findings based on inadmissible evidence." *In re A.J.L.H.*, 275 N.C. App. 11, 23 (2020). Thus,

the Court of Appeals vacated and remanded the trial court's adjudication concerning Margaret "for a new hearing at which the trial court should make findings on properly admitted clear and convincing evidence." *Id.*

The Court of Appeals' analysis conflicts with this Court's precedent in several ways. First, "out-of-court statements offered for purposes other than to prove the truth of the matter asserted are not considered hearsay." *State v. Call*, 349 N.C. 382, 409 (1998). Among the many hearsay exceptions are "statements of one person to another to explain subsequent actions taken by the person to whom the statement was made." *Id.*

Here, when respondents objected to the testimony concerning Margaret's out-of-court statements, counsel for the guardian ad litem explained that "this is all part of the reporting process and the investigation process which is not considered offered for the truth of the matter asserted." In other words, counsel argued that this testimony established *why* DHHS began to investigate respondents and to ask them specific questions about Margaret's abuse. Margaret's statements are admissible for this purpose, which is not to prove the truth of Margaret's own out-of-court statements. *Id.*

To be sure, the trial court never *expressly* stated that it was admitting this evidence solely for this permissible purpose. But a trial court's "ruling on an evidentiary point will be presumed to be correct unless the complaining party can demonstrate that the particular ruling was in fact incorrect." *State v. Herring*, 322

N.C. 733, 749 (1988). Nothing in the record indicates that the trial court admitted this testimony to impermissibly prove the truth of the matter, as opposed to permissibly establishing the sequence of events that led Joyce to interview respondents. Thus, the Court of Appeals should not have presumed that the trial court's ruling was erroneous and should have instead treated these findings as non-substantive evidentiary findings.

In any event, the Court of Appeals also erred by declining to examine the remaining evidentiary findings. Instead, the Court of Appeals held that the trial court's "adjudication is heavily reliant and intertwined with its findings based on inadmissible evidence" and therefore vacated and remanded the case for a new hearing and new fact findings. *In re A.J.L.H.*, 275 N.C. App. at 23.

Again, this conflicts with our precedent. When reviewing findings of fact in a juvenile order, the reviewing court "simply disregards information contained in findings of fact that lack sufficient evidentiary support" and examines whether the remaining findings support the trial court's determination. *In re A.C.*, 378 N.C. 377, 394 (2021). The reviewing court should not speculate about how "heavily" the trial court might have relied on one finding as opposed to another. The sole question for the reviewing court is whether the trial court's conclusions of law are supported by adequate findings and whether those findings, in turn, are supported by clear, cogent, and convincing evidence. *In re E.H.P.*, 372 N.C. 388, 392 (2019). We thus turn to examining the trial court's substantive evidentiary findings and whether they

support the trial court's adjudications of abuse and neglect.

## II.    Findings of fact concerning Margaret

We first address the trial court's adjudication of Margaret as an abused and neglected juvenile.

Under section 7B-101, an abused juvenile is defined as one whose parent or caretaker

> a.  Inflicts or allows to be inflicted upon the juvenile a serious physical injury by other than accidental means;
>
> b.  Creates or allows to be created a substantial risk of serious physical injury to the juvenile by other than accidental means;
>
> c.  Uses or allows to be used upon the juvenile cruel or grossly inappropriate procedures or cruel or grossly inappropriate devices to modify behavior . . . .

N.C.G.S. § 7B-101(1) (2021).

DHHS alleged in the petition that Margaret was an abused juvenile under each of these three grounds. "There is a commonality present in these criteria. Each definition states that a juvenile is abused when a caretaker harms the juvenile in some way, allows the juvenile to be harmed, or allows a substantial risk of harm. The harm may be physical; emotional; or some combination thereof." *In re M.G.*, 363 N.C. 570, 573 (2009). At its core, "the nature of abuse, based upon its statutory definition, is the existence or serious risk of some nonaccidental harm inflicted or allowed by one's caretaker." *Id.* at 574.

Applying this standard to the evidentiary findings of the trial court, the court's

adjudication of abuse is proper. First, the trial court found that Lisa Joyce, the DHHS social worker, investigated a child protective services report that Margaret "had three marks on her mid back where the skin was broken from what appeared to be a belt mark" and, later, a "new injury" that was "a red bruise a little larger than a silver dollar on her lower neck between her shoulders." When Joyce examined Margaret at school, she saw "marks on her lower back and a mark near her neck area" as described by the reports.

Joyce then interviewed respondents about Margaret's injuries. The trial court recounted their statements in its findings. Both respondents confirmed that they caused the injuries to Margaret. Respondent-mother told Joyce that she "did physically discipline [Margaret] by whipping her" and that respondent-father "also physically disciplined her." Respondent-mother further explained that Margaret's injuries were "an accident because [Margaret] was moving around while [respondent-father] was trying to discipline her."

Respondent-mother also confirmed that, in addition to whipping Margaret with a belt, respondents disciplined Margaret by forcing her to stand in the corner for many hours at a time and to sleep on the floor. Respondent-mother explained that this discipline "did not normally occur every day, but had been occurring every day lately."

Respondent-father similarly told Joyce that he often "physically disciplined [Margaret] with a belt." He also confirmed that respondents often forced Margaret to

"stand in the corner for 2-3 hours" and made her sleep on the floor. He told Joyce that this discipline had been "occurring a lot" for the last two months.

All of these findings are supported by clear, cogent, and convincing evidence in the record—largely from respondents' own admissions to Joyce as she investigated the reports of abuse. Moreover, these findings readily are sufficient to show that respondents used or allowed to be used on Margaret "cruel or grossly inappropriate procedures or cruel or grossly inappropriate devices to modify behavior." N.C.G.S. § 7B-101(1)(c).

To be sure, when used sparingly, none of respondents' chosen forms of discipline—physically striking a child, forcing a child to stand for hours in a corner, or forcing a child to sleep on the floor—would *compel* a finding of abuse. But the trial court found that respondents did *not* use this discipline sparingly. They imposed all this discipline—whipping Margaret with a belt, making her stand in a corner for hours on end, and forcing her to sleep on the bare floor without covers—for days and days at a time, possibly as long as two months. That is abuse under our juvenile code. *Id.*

The trial court also adjudicated Margaret as a neglected juvenile. This, too, is a proper adjudication. Among other grounds, a juvenile may be adjudicated as neglected when the juvenile "lives in an environment injurious to the juvenile's welfare." *Id.* § 7B-101(15) (2019) (amended 2021).

Here, the trial court found that both respondents told Joyce that they "did not

see anything wrong" or "had no concerns" with this discipline of Margaret. Moreover, even several months after DHHS became involved, in response to DHHS workers' concerns about the discipline, respondents maintained that their disciplinary approach was appropriate and was necessary to "teach" Margaret that her misbehavior was wrong. These findings are supported by clear, cogent, and convincing evidence in the record and support the trial court's finding that respondents created "an environment injurious to the juvenile's welfare." *Id.*

### III.  Findings of fact concerning Chris and Anna

We next address the trial court's adjudication of Chris and Anna as neglected juveniles. The neglect statute provides that in "determining whether a juvenile is a neglected juvenile, it is relevant whether that juvenile lives in a home where another juvenile . . . has been subjected to abuse or neglect by an adult who regularly lives in the home." *Id.*

An adjudication of neglect cannot be "solely based upon previous Department of Social Services involvement relating to other children." *In re J.A.M.*, 372 N.C. 1, 9 (2019). Instead, the trial court must find "the presence of other factors to suggest that the neglect or abuse will be repeated." *Id.* at 9–10.

Here, the Court of Appeals reversed the trial court's adjudication of neglect because "[n]othing in the record indicates Chris or Anna had been harmed or were at risk of being harmed" and that, in the Court of Appeals' view, the trial court "concluded Chris and Anna were neglected based solely on its conclusion Margaret

was purportedly abused and neglected." *In re A.J.L.H.*, 275 N.C. App. at 24.

This is not an accurate characterization of the trial court's findings and conclusions with respect to Chris and Anna. Although a trial court cannot rely solely on abuse of another child in the home as a basis for a neglect adjudication, we have emphasized that a trial court "need not wait for actual harm to occur to the child if there is a substantial risk of harm to the child in the home." *In re T.S., III,* 178 N.C. App. 110, 113 (2006), *aff'd per curiam,* 361 N.C. 231 (2007). This is particularly true for very young children, where the evaluation "must of necessity be predictive in nature, as the trial court must assess whether there is a substantial risk of future abuse or neglect of a child based on the historical facts of the case." *In re J.A.M.*, 372 N.C. at 9.

When determining the weight to be given to a finding of abuse of another child in the home, a critical factor is whether the respondent indicates a willingness to "remedy the injurious environment that existed" with respect to the older child. *In re A.W.*, 377 N.C. 238, 249 (2021). Facts that can demonstrate a parent's unwillingness to remedy the injurious environment include failing to acknowledge the older child's abuse or insisting that the parent did nothing wrong when the facts show the parent is responsible for the abuse. *See id.* at 248–49; *In re J.A.M.*, 372 N.C. at 10.

Here, the trial court adjudicated Margaret abused based on findings of cruel and grossly inappropriate discipline by respondents, as explained above. The trial court also found that respondents refused to acknowledge that this discipline was

inappropriate and maintained that it was necessary to address Margaret's behavioral problems. Indeed, the trial court expressly found that, in discussions with social workers, respondent-father "never disclosed that he would not discipline [Chris and Anna] in the same manner that he had discipline[d] [Margaret]." This finding is supported by the social worker's testimony in the record.

Under our precedent, the trial court was not required to wait for Chris and Anna to reach the same age as Margaret before determining that they, too, face a substantial risk of harm from these cruel and inappropriate disciplinary measures. The key "other factor" in this case, beyond the abuse of Margaret, is respondents' inability to recognize that it *was* abuse, and their corresponding inability to commit to never repeating it. *In re J.A.M.*, 372 N.C. at 9. As in *In re J.A.M.* and *In re A.W.*, the trial court in this case found that respondents failed to acknowledge their role in the abuse determination of an older sibling and would not acknowledge that their conduct was wrong. *Id.* at 10. In light of these findings, the trial court properly determined by clear, cogent, and convincing evidence that there was a substantial risk that Chris and Anna likewise faced harm if they remained in the home and, as a result, properly adjudicated Chris and Anna as neglected juveniles. *Id.* at 9.

## IV.  Disposition order and visitation ruling

Finally, we address the trial court's disposition order. Because the Court of Appeals vacated and remanded the adjudication order with respect to all three juveniles, there was no need for the Court of Appeals to address the disposition phase.

But the Court of Appeals chose to address the disposition anyway. Specifically, the Court of Appeals instructed the trial court that, if the court again adjudicated Margaret as abused or neglected, the trial court must "order generous and increasing visitation between Margaret and her mother." *In re A.J.L.H.*, 275 N.C. App. at 25.

This instruction to the trial court is improper and beyond the role of an appellate court. A trial court order "that removes custody of a juvenile from a parent, guardian, or custodian or that continues the juvenile's placement outside the home shall provide for visitation that is in the best interests of the juvenile consistent with the juvenile's health and safety, including no visitation." N.C.G.S. § 7B-905.1(a) (2021).

The assessment of the juvenile's best interests concerning visitation is left to the sound discretion of the trial court and "appellate courts review the trial court's assessment of a juvenile's best interests solely for an abuse of discretion." *In re K.N.L.P.*, 380 N.C. 756, 759 (2022). "Under this standard, we defer to the trial court's decision unless it is manifestly unsupported by reason or one so arbitrary that it could not have been the result of a reasoned decision." *Id.* Moreover, even in the rare cases in which we determine that a trial court acted arbitrarily and unreasonably, the remedy is to vacate the disposition order but to "express no opinion as to the ultimate result of the best interests determination on remand, as that decision must be made by the trial court." *In re R.D.*, 376 N.C. 244, 264 (2020).

On remand, the Court of Appeals should apply this standard to the disposition

order. The Court of Appeals should not substitute its own judgment for that of the trial court; if it determines that the trial court's order meets the high bar for abuse of discretion, the appropriate remedy is to explain how the trial court abused its discretion, vacate the disposition order, and remand for the trial court to enter a new order in the exercise of the trial court's discretion. *Id.*

## Conclusion

The trial court properly adjudicated Margaret as an abused and neglected juvenile and properly adjudicated Chris and Anna as neglected juveniles. The Court of Appeals erred by vacating or reversing those adjudications. We reverse the decision of the Court of Appeals and remand for that court to address respondents' remaining arguments concerning the disposition order.[2]

REVERSED AND REMANDED.

---

[2] The Court of Appeals opinion also contains a section titled "Parental Rights" that discusses respondents' constitutionally protected rights to parent their children. This Court repeatedly has held that this constitutional issue cannot be addressed on appeal unless properly preserved by the parties. *E.g.*, *In re R.D.*, 376 N.C. at 253; *In re J.N.*, 381 N.C. 131, 133 (2022). Here, respondents did not assert a constitutional challenge on this basis in the trial court and did not raise the issue in their appellate briefing at the Court of Appeals. Accordingly, on remand, the Court of Appeals should not address this constitutional issue.

Justice MORGAN concurring in part and dissenting in part.

While I concur with the majority's reversal of the portion of the Court of Appeals decision which vacated and remanded the trial court's adjudication and disposition order establishing that Margaret was an abused and neglected juvenile plus mandating the trial court's potential determinations regarding visitation, in my view the lower appellate court was correct in opining that "[n]othing in the record indicates Chris or Anna had been harmed or were at risk of being harmed." *In re A.J.L.H.*, 275 N.C. App. 11, 24 (2020). Therefore, I respectfully dissent from the conclusion reached by the majority to uphold the trial court's adjudication of Chris and Anna as neglected juveniles.[1] Accordingly, I would affirm the Court of Appeals decision to the extent that it reversed the trial court's conclusion that Chris and Anna were neglected juveniles.

While in "determining whether a juvenile is a neglected juvenile, it is relevant whether that juvenile . . . lives in a home where another juvenile has been subjected to abuse or neglect by an adult who regularly lives in the home," N.C.G.S. § 7B-101(15) (2021), it is well established that "[a] court may not adjudicate a juvenile neglected *solely* based upon previous Department of Social Services involvement relating to other children. Rather, . . . the clear and convincing evidence in the record

---

[1] A neglected juvenile is one "whose parent, guardian, custodian, or caretaker does not provide proper care, supervision, or discipline; . . . or who lives in an environment injurious to the juvenile's welfare." N.C.G.S. § 7B-101(15) (2019).

must show *current circumstances* that present a risk to the juvenile." *In re J.A.M.*, 372 N.C. 1, 9 (2019) (emphases added). The abuse or neglect of a juvenile, standing alone, cannot support an allegation of neglect for the juvenile's siblings; for allegations of the neglect of siblings of an abused and neglected juvenile to be substantiated, there must also appear " 'other factors' indicating a present risk to" a juvenile for him or her to be adjudicated as neglected. *Id.* at 10.

The majority in the present case cites and quotes *In re A.W.*, 377 N.C. 238, 248–49 (2021) for the proposition that "[w]hen determining the weight to be given to a finding of abuse of another child in the home, a critical factor is whether the respondent [parent] indicates a willingness to 'remedy the injurious environment that existed' with respect to the older child." In *In re A.W.*,[2] the child Anna was brought to the emergency room of a hospital at the age of two months with a severe traumatic brain injury and other significant injuries—none of which could be explained by her parents—and Anna died four days later as a result of blunt force injuries to her head. 377 N.C. at 239–40. Almost exactly one year later, A.W.—known as Abigail in this proceeding—was born to respondent-parents. The local Department of Social Services (DSS) obtained nonsecure custody of Abigail and filed a petition alleging that Abigail—much like the juveniles Chris and Anna in the present case with regard to their older sibling Margaret—

---

[2] Pseudonyms are used to protect the identities of children in juvenile cases and for ease of reading.

> was a neglected juvenile in that her sibling, Anna, died in the care of respondents as a result of suspected abuse and neglect. Respondents reported they were the only caregivers and gave no explanation for Anna's injuries. Respondent-father was incarcerated on charges related to Anna's death, and respondent-mother's involvement in Anna's death had not been ruled out. Because of the nature of Anna's injuries and death, Abigail was at substantial risk of abuse and neglect if she remained in respondents' care and supervision.

*Id.* at 241. DSS then filed a petition to terminate the mother's parental rights, alleging therein that "respondent-mother had neglected Abigail, and there was no indication that she was willing or able to correct the conditions that lead [sic] to Anna's death and the injurious environment that was present in her home, and respondent-mother was incapable of providing for the proper care and supervision of Abigail such that Abigail was a dependent juvenile." *Id.* (citing N.C.G.S. § 7B-1111(a)(1), (a)(6) (2019)). Ultimately, the trial court entered an order "concluding that grounds existed to terminate respondent-mother's parental rights in Abigail pursuant to N.C.G.S. § 7B-1111(a)(1) and (6) . . . [and] determined that it was in Abigail's best interests that respondent-mother's parental rights be terminated." *Id.* at 242.

On appeal, this Court considered the evidence adduced at trial and the trial court's subsequent findings of fact, particularly with regard to the mother's representation to law enforcement investigators of her proffered theory to the doctor who treated Anna's injuries that the parents' large dog could have caused them, along with the mother's later deduction that the father "wasn't holding [Anna] right, and

holding her with his one arm, and she slipped out of his arms." *Id.* at 246. We noted that "[i]n neglect cases *involving newborns*, 'the decision of the trial court must of necessity be predictive in nature, as the trial court must assess whether there is a substantial risk of future abuse or neglect of a child based on the historical facts of the case.' " *Id.* at 248 (emphasis added) (quoting *In re J.A.M.*, 372 N.C. at 9). This Court then specifically emphasized that

> although the trial court considered the fact that Abigail lived in the same home where Anna died as a result of an act of one or both respondents, this was not the sole basis for the trial court's conclusion that Abigail was a neglected juvenile. Rather, the trial court also found the presence of other factors demonstrating that Abigail presently faced a substantial risk in her living environment: respondent-mother continued to provide the implausible explanation that her dog caused Anna's head injury; respondent-mother failed to provide an explanation that accounted for Anna's other injuries; there were no means by which the court could determine what caused Anna's death and "thereby insure the safety of [Abigail]"; respondent-mother continued to be in a relationship with respondent-father; and respondents colluded to deceive the court about the status of their relationship. In conjunction with the fact that Anna died in the home at the hands of one or both respondents, the findings of respondent-mother's ongoing failure to recognize and accept the cause of Anna's injuries and resulting death, and her continued relationship with respondent-father, establish that respondent-mother was unable to ensure Abigail's safety and that Abigail was at a substantial risk of impairment. Respondent-mother did not remedy the injurious environment that existed for Anna, and the trial court properly concluded that Abigail was a neglected juvenile.

*Id.* at 248–49.

In my view, the Court of Appeals was correct in the instant case in determining that the trial court's adjudication of then-three-year-old Chris and six-month-old Anna as neglected was erroneous because that decision was based *solely* upon the trial court's adjudication of their then-nine-year-old sibling Margaret, who lived in the same household, to be an abused and neglected juvenile. The lower appellate court correctly reached this determination, as I see it, based upon the forum's express and accurate determination, consistent with our directive in *In re J.A.M.*, that there were no other factors which existed in addition to Margaret's adjudication as abused and neglected which constituted a risk to the children Chris and Anna that emanated from current circumstances existing in the household at the time that Chris and Anna were adjudicated as neglected. Conversely, my distinguished colleagues in the majority unfortunately ignore the requirement for "the presence of other factors to suggest that the neglect or abuse will be repeated" which we established in *In re J.A.M.*, 372 N.C. at 9–10 (extraneity omitted), in their haste to cobble together various principles from our juvenile case opinions which are inapposite here, including the majority's regrettable conflation of "predictive" behavior with the majority's speculative projections and the majority's specter of "substantial risk of harm" as we identified for newborn juveniles in *In re A.W.*, as compared to the majority's convenient approach to siblings here who spanned ages ranging from post-toddler to preteen.

I respectfully concur in part and dissent in part.

Justice EARLS joins in this concurring in part and dissenting in part opinion.